No. 24-_____

_____

**IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

_____

IN RE APPLE IPHONE ANTITRUST LITIGATION

_____

On Petition for Permission to Appeal from the
U.S. District Court for the Northern District of California
Case No. 4:11-cv-6714 | Hon. Yvonne Gonzalez Rogers

_____

**PETITION FOR PERMISSION TO APPEAL
UNDER RULE 23(f)**

_____

Cynthia E. Richman
Harry R. S. Phillips
Victoria C. Granda
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036
(202) 955-8500

Caeli A. Higney
Julian W. Kleinbrodt
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center
Suite 2600
San Francisco, CA 94111
(415) 393-8200

Theodore J. Boutrous Jr.
Daniel G. Swanson
Bradley J. Hamburger
Matt Aidan Getz
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7000

*Counsel for Petitioner Apple Inc.*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, petitioner Apple Inc., a publicly traded company (NYSE: AAPL), states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

Dated: February 16, 2024       Respectfully submitted,

/s/ Theodore J. Boutrous Jr.
Theodore J. Boutrous Jr.

*Counsel for Petitioner*
*Apple Inc.*

i

# TABLE OF CONTENTS

Page

INTRODUCTION ........................................................................... 1

RELIEF SOUGHT ......................................................................... 5

JURISDICTIONAL STATEMENT ................................................. 5

QUESTIONS PRESENTED ........................................................... 6

BACKGROUND............................................................................ 6

STANDARD OF REVIEW ............................................................ 11

REASONS FOR GRANTING REVIEW ........................................ 11

I.     The Certification Order Is Manifestly Erroneous
       Because the District Court Did Not Rigorously
       Analyze Whether Individualized Issues Relating to
       Injury Predominate. ........................................................... 11

II.    This Court Should Clarify That No Class Can Be
       Certified Based on an Expert Model That Masks
       Individualized Issues Necessary to Determine
       Whether Class Members Are Injured. .................................. 21

CONCLUSION ............................................................................. 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Apple Inc. v. Pepper*,
139 S. Ct. 1514 (2019) ............................................................7, 12

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ....................................................... 20

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) ..................................................... 11

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...................................................................... 25

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) ............................................3, 17, 24

*Epic Games, Inc. v. Apple Inc.*,
67 F.4th 946 (9th Cir. 2023) ...................................................5, 6, 8

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) ..................................................................... 5

*Ferreras v. Am. Airlines, Inc.*,
946 F.3d 178 (3d Cir. 2019) ....................................................... 16

*In re Google Play Store Antitrust Litig.*,
2023 WL 5532128 (N.D. Cal. Aug. 28, 2023) .............................. 30

*In re Hydrogen Peroxide Antitrust Litig.*,
552 F.3d 305 (3d Cir. 2008) ..................................................2, 15

*In re Interest Rate Swaps Antitrust Litig.*,
2023 WL 8675625 (S.D.N.Y. Dec. 15, 2023) .............................. 23

*In re Lithium Ion Batteries Antitrust Litig.*,
2018 WL 1156797 (N.D. Cal. Mar. 5, 2018) ............................... 28

iii

*Olean Wholesale Grocery Cooperative, Inc. v.*
 *Bumble Bee Foods LLC,*
 31 F.4th 651 (9th Cir. 2022) ......... 1, 2, 3, 4, 11, 12, 13, 15, 17, 18,
 ................................................. 19, 20, 21, 22, 23, 24, 25, 26, 30

*In re Optical Disk Drive Antitrust Litig.,*
 303 F.R.D. 311 (N.D. Cal. 2014) ................................................. 28

*In re Rail Freight Fuel Surcharge Antitrust Litig.,*
 725 F.3d 244 (D.C. Cir. 2013) ..................................................... 23

*TransUnion LLC v. Ramirez,*
 594 U.S. 413 (2021) ..................................................................... 11

*United States v. Microsoft Corp.,*
 56 F.3d 1448 (D.C. Cir. 1995) ..................................................... 29

*Van v. LLR, Inc.,*
 61 F.4th 1053 (9th Cir. 2023) ..................................................... 13

*Wal-Mart Stores, Inc. v. Dukes,*
 564 U.S. 338 (2011) ..................................................................... 15

## Constitutional Provisions

U.S. Const. art. III....................................................................11, 20

## Statutes

28 U.S.C. § 1292(e) ......................................................................... 5

## Rules

Fed. R. Civ. P. 23 ......................... 2, 3, 4, 13, 14, 15, 17, 18, 21, 23, 24

Fed. R. Civ. P. 23(b)(3) ................................................1, 2, 3, 9, 17, 25

Fed. R. Civ. P. 23(f).............................. 1, 4, 5, 11, 16, 21, 30, 31

Fed. R. Evid. 702 ....................................................3, 4, 9, 10, 16, 17

iv

## INTRODUCTION

This case presents the same important issues this Court was poised to address on Rule 23(f) review in *In re Google Play Store Antitrust Litigation*, No. 23-15285, before that appeal was mooted by the district court's decision to decertify the class. The sweeping certification order here—which encompasses tens of millions of members, including millions who are uninjured, based on unproven "representations"—demonstrates the continued need for definitive resolution of these issues.

**I.** A recurring issue in antitrust class actions is determining whether Rule 23(b)(3)'s demanding predominance requirement is satisfied—most significantly with respect to whether plaintiffs can prove that each class member suffered an injury. This Court in *Olean Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651 (9th Cir. 2022) (en banc), emphasized that district courts must rigorously analyze "whether individualized questions, including those regarding class members' injury, 'will overwhelm common ones and render class certification inappropriate.'" *Id.* at 669. *Olean* also held that the party seeking certification must prove,

1

by a preponderance of the evidence, that Rule 23 is satisfied *before* any class is certified. *Id.* at 663-64.

Despite this Court's guidance in *Olean*, the certification order here does not reflect the analysis Rule 23 demands, which underscores the need for further clarity regarding how courts are to apply Rule 23(b)(3) to cases like this one. Three manifest errors have now resulted in the certification of a massive nationwide class that, even according to Plaintiffs' own expert, includes at least 10 million uninjured Apple App Store accounts.

*First*, the district court expressly embraced a conditional view of Rule 23, certifying the class based on Plaintiffs' "surmise" and "representations" that in the future their classwide injury model would be able to "successfully ascertain the number of uninjured class members and limit them." Order 25-28. But Rule 23 forbids such conditional certification; courts cannot "rely on later developments to determine whether certification is appropriate." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 319-20 (3d Cir. 2008).

*Second*, the district court declined to address numerous problems with Plaintiffs' expert evidence because it concluded that the

2

expert's model was admissible under Rule 702. But as this Court has explained, Rule 23 forbids a court to "end its analysis of the plaintiffs' evidence after determining such evidence was merely admissible," *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 982 (9th Cir. 2011), and instead requires that the court "weigh[] conflicting expert testimony and resolv[e] expert disputes" to "ensure that Rule 23(b)(3)'s requirements are met," *Olean*, 31 F.4th at 666 (cleaned up).

*Third*, because their model deemed almost one-fifth of class accounts to be unharmed, Plaintiffs redefined their proposed class to jettison accounts that spent less than $10 to reduce the total number of uninjured class members. That cutoff is wholly arbitrary because a $10 threshold has no relevance to Plaintiffs' liability theory (and discards millions of purportedly injured accounts as well). This attempt to gerrymander a class definition using a crude and ineffective proxy for injury contravenes *Olean*. Although overbroad classes can potentially be narrowed to those people who "can rely on the same body of common evidence to establish the common issue," they cannot simply be redefined to exclude members who are uninjured

3

because that risks creating an impermissible fail-safe class. *Olean*, 31 F.4th at 669 n.14.

**II.** Review under Rule 23(f) is also warranted so the Court can address unresolved issues relating to assessing expert models claiming to show classwide injury. Specifically, *Olean* left for another day the question whether issues undercutting a model's reliability—for instance, "unsupported assumptions, erroneous inputs, or nonsensical outputs such as false positives"—could preclude the model from being used to prove classwide antitrust impact. 31 F.4th at 683. This case is an ideal vehicle to address that critical issue.

Plaintiffs' model, their only common evidence of alleged injury, has exactly the sort of flaws *Olean* previewed. It is half baked, depends on assumptions that are untested or unsupported, and produces a vast number of false positives that contradict real-world evidence. The district court reasoned that these defects go to "weight, not admissibility," Order 8—but that is a Rule 702 answer, not a Rule 23 answer. This Court should make clear that certification cannot be premised on a model that flouts real-world evidence and

foundational tenets of economics, particularly where the model *itself* has not been proven capable of screening out uninjured members.

The time for review is now. An expansive class filled with millions of uninjured members has been certified, even though this Court has already affirmed the district court's rejection of an antitrust challenge to the same App Store practices at issue. *Epic Games, Inc. v. Apple Inc.*, 67 F.4th 946, 998-99 (9th Cir. 2023). Certification can "place[] pressure on the defendant to settle even unmeritorious claims." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 524 (2018). Rule 23(f) was designed as a safety valve to prevent that result in cases, like this one, where the certification order is both significant in scope and manifestly erroneous.

## RELIEF SOUGHT

The Court should grant Rule 23(f) review and reverse the class-certification order.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1292(e) and Federal Rule of Civil Procedure 23(f). The district court granted class certification on February 2, 2024. Dkt. 789.

5

## QUESTIONS PRESENTED

**1.** Is the certification order manifestly erroneous because the district court conditionally certified a class without rigorously analyzing whether individualized issues relating to each class member's injury will predominate over common questions?

**2.** Can a district court certify a class based on an injury model that masks individualized differences affecting whether millions of class members were injured at all?

## BACKGROUND

**1.** Apple's App Store connects app developers with Apple device users. *Epic Games*, 67 F.4th at 966-68. Consumers can download a variety of apps on the store in more than two dozen categories. Dkt. 642-16 ¶¶ 76-77. More than 80% of these apps are free. *Id.* ¶ 48. For other apps, developers set a purchase price for the app or charge for in-app purchases of digital goods and services. *Id.* ¶¶ 61-64. Developers set prices on "price tiers" generally ending in 99 cents. Dkt. 688-7 ¶¶ 11-12.

From the App Store's inception, Apple charged developers a 30% commission on sales of apps and in-app purchases. *Epic Games*,

6

67 F.4th at 968. In 2016, Apple cut its commission to 15% for subscription renewals after the first year. Dkt. 688-3 ¶ 74. In 2016 and 2020, respectively, Apple also decreased its commission rate for certain video-streaming apps and for app developers that earned less than $1 million per year in net proceeds. *Id.* ¶¶ 55, 89. Those decreases, which affected digital products accounting for 29% of all App Store commerce, had no effect on the vast majority of prices developers charged for the affected apps. *Id.* ¶¶ 41, 51-54; Dkt. 740-2 at 3 n.9.

**2.** Plaintiffs are iPhone and iPad users. They claim that Apple unlawfully monopolized (or attempted to monopolize) an alleged single-brand market for iPhone and iPad apps and in-app purchases by requiring that all such apps be distributed through the App Store. Dkt. 229 ¶¶ 79, 84. Plaintiffs allege that these restraints enabled Apple to charge supracompetitive commissions to *developers*, who in turn set higher app and in-app purchase prices for *consumers*. *Id.* ¶¶ 53-58.

Plaintiffs' complaint was dismissed on standing grounds in 2013 but reinstated in 2019 by a 5-4 vote of the Supreme Court. *Apple Inc. v. Pepper*, 139 S. Ct. 1514, 1519, 1521 (2019). This case then

7

proceeded alongside other litigation challenging the same App Store conduct.  In 2021, the district court tried one such case, brought by game developer Epic Games, and found for Apple on all antitrust claims. *Epic Games*, 67 F.4th at 969-72.  This Court affirmed, agreeing that Apple's App Store conduct is procompetitive because it helps "improve device security and user privacy" and "increases interbrand competition." *Id.* at 986-90, 998-99.

**3.**  In mid-2021, Plaintiffs first sought certification of a class of millions of U.S. consumers with Apple App Store accounts who paid for an app or made an in-app purchase since 2008.  Dkt. 441.  Plaintiffs relied solely on expert testimony to show classwide injury.  Their expert first estimated the commission rate Apple would have charged absent the challenged conduct. *Id.* at 22.  He then used an econometric model to estimate the app and in-app purchase prices developers would have set had they been subject to this lower commission rate. *Id*.  The expert used these "but-for" prices to estimate how much each account would have paid for digital content absent the restraints.  Dkt. 643-11 ¶¶ 227-44.  Although the App Store has 27 categories of apps, Plaintiffs' model can predict prices for only

8

three: games, music, and entertainment. *Id.*; Dkt. 688-5 ¶¶ 28-29, 183-89. Plaintiffs' model also predicted injury as to only Apple ID accounts, not individual class members; Plaintiffs propose identifying harmed *individuals* in a post-trial claims-administration process. Dkt. 643-36 ¶¶ 10-16.

The district court denied certification without prejudice because it ruled that Plaintiffs' model was inadmissible under Rule 702. Dkt. 630 at 1-2. The model was "flawed" and "unreliable," *id.* at 1, 18, including because it "ignore[d]" Apple's 99-cent price tiers and focal-point pricing, *id.* at 11-12. Thus, Plaintiffs "could not meet their predominance burden" under Rule 23(b)(3) because their purported common proof of impact could not "reliably demonstrate which members, and how many, were injured." *Id.* at 25.

**4.** Plaintiffs again sought certification in late 2022, relying on the same core methodology with some modest tweaks. Dkt. 666-1. Plaintiffs' model still found that more than 30 million Apple ID accounts would have *paid more* for apps and in-app content—and thus suffered *no injury*—absent Apple's challenged conduct. Dkt. 679-1 at 32; Dkt. 688-5 ¶¶ 56, 58. To reduce the number of unharmed

9

accounts, Plaintiffs limited the class definition to consumers who spent more than $10 from any one account. Dkt. 666-1 at 1, 15. Even with this narrowing, the model still leaves about 10.28 million unharmed accounts (7.9% of class accounts). Dkt. 786-1 ¶¶ 10-11.

This time, the district court granted Plaintiffs' motion. The bulk of the court's order explained its conclusion that Plaintiffs' expert testimony was admissible under Rule 702. Order 6-23. The court then concluded in a footnote that its admissibility determination resolved all expert-related issues affecting the propriety of certification. *Id.* at 24 n.18.

The court noted it was "concerned" that Plaintiffs' model showed so many uninjured accounts. Order 26. But the court credited Plaintiffs' "representations" and "surmise" "[a]t this juncture" that the actual number of uninjured accounts would be lower "once the model is fully run" across all App Store categories (including those for which no model has yet been built) and accounts are linked to individual class members. *Id.* at 25-27. The court ordered the parties to report back whether Plaintiffs' model "can successfully ascertain the number of uninjured class members and limit them," *id.*

10

at 27-28, and indicated it would consider decertification if the model turned out to be defective, *id.* at 1.

## STANDARD OF REVIEW

Rule 23(f) review is warranted when a class-certification decision "is manifestly erroneous" or "presents an unsettled and fundamental issue of law relating to class actions, important both to the specific litigation and generally, that is likely to evade end-of-the-case review." *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 959 (9th Cir. 2005) (per curiam).

## REASONS FOR GRANTING REVIEW

### I.    The Certification Order Is Manifestly Erroneous Because the District Court Did Not Rigorously Analyze Whether Individualized Issues Relating to Injury Predominate.

Injury is an "essential element[]" of every antitrust claim, *Olean*, 31 F.4th at 666, and "[e]very class member must have Article III standing in order to recover individual damages," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  In *Olean*, this Court explained what that means for class-certification purposes:  district courts must engage in a "rigorous analysis" to determine whether individualized questions, including those regarding class members'

11

injury, 'will overwhelm common ones and render class certification inappropriate.'" 31 F.4th at 669. Plaintiffs must prove by a preponderance of the evidence that common injury questions predominate—and must do so "before" certification. *Id.* at 664.

If any case warranted a rigorous analysis of injury, it was this one. To show that the challenged conduct produced antitrust injury, Plaintiffs must analyze the relationship (if any) between a commission rate and the prices consumers pay. That in turn depends on each developer's unique costs and business model, the competition the developer faces, the price sensitivity of its customers, and prevailing pricing practices. *Cf. Pepper*, 139 S. Ct. at 1523; *id* at 1528 (Gorsuch, J., dissenting). Plaintiffs must also reconcile their model's conclusions with the overwhelming real-world evidence that app transaction prices generally "stay[] the same" when commission rates drop. Order 8. In other words, consumers pay the same amount regardless of Apple's conduct, and suffer no injury at all on those transactions.

Plaintiffs' proposed solution to that problem is an expert model that, even after many tweaks and an arbitrary spending cutoff,

12

concededly contains over ten million accounts without any injury. Order 26. That number alone is jarring, yet it significantly understates the problem. Plaintiffs have not even disclosed a model that estimates prices for 24 of the 27 categories of apps, and thus cannot predict injury for over 80% of the 171 million accounts at issue. Dkt. 740-3 ¶ 3. And extrapolating from Plaintiffs' incomplete sample would be inappropriate because even "slight[]" changes to the model produce dramatic changes, with millions of accounts switching between harmed and unharmed. Order 15.

Rule 23's mandate was clear: the district court had to determine whether Plaintiffs had proven, by a preponderance of the evidence, whether uninjured class members could be "'winnow[ed] out'" in a manageable class trial, or whether instead the work of dividing injured from uninjured would "'predominate and render an adjudication unmanageable.'" *Olean*, 31 F.4th at 669 & n.13; *see Van v. LLR, Inc.*, 61 F.4th 1053, 1068-69 (9th Cir. 2023) (when defendants "substantiate[]" individualized injury questions, the court must determine whether "class-member-by-class-member assessment" is

13

"unnecessary or workable").  In three independent ways, the certification order does not reflect that necessary analysis.

*First*, although the district court noted serious doubts about Plaintiffs' ability to establish injury on a classwide basis, it ultimately granted certification by embracing an impermissible wait-and-see approach to Rule 23.  The court was "concerned," for instance, that over ten million accounts in Plaintiffs' latest model are uninjured, but it determined that figure was irrelevant given Plaintiffs' "representations" that it would drop "once the model is fully run."  Order 26.  The court also credited Plaintiffs' "surmise" that, "[b]ecause there are many more accounts than iPhone users," the "actual number of class members that are uninjured" will be "significantly lower" than the accounts deemed uninjured in Plaintiffs' model, *id.* at 25—even though Plaintiffs' expert disclaimed any such opinion, Dkt. 688-10 at 236.

Perhaps the most telling indication of the conditional nature of the certification order is that, after certifying the class, the district court ordered the parties to report back "whether the model can successfully ascertain the number of uninjured class members and limit

14

them." Order 27-28. The court made clear the reason for its request: in its view, if the actual evidence did not live up to Plaintiffs' representations and surmise, it could just decertify the class. *Id.* at 1. In short, the certification order treats Rule 23 as a "mere pleading standard" discharged by what Plaintiffs promise to do rather than what they have proven can be done. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

That certify-now, analyze-later approach conflicts with the settled requirements of Rule 23. The rule originally permitted "conditional" certification, and some courts concluded that meant certification could "'be granted on a tentative basis.'" *Hydrogen Peroxide*, 552 F.3d at 319. But that language was removed in 2003 to make clear that, if there are any doubts about whether "'the requirements of Rule 23 have been met,'" the court "'should refuse certification until they have been met.'" *Id.* (quoting Fed. R. Civ. P. 23 advisory committee's note to 2003 amendments). Simply put, "'courts should not rely on later developments to determine whether certification is appropriate,'" *id.* at 320; they must assess the evidence and come to a definitive conclusion "before" certification, *Olean*, 31 F.4th at 664.

15

The decision in *Ferreras v. American Airlines, Inc.*, 946 F.3d 178 (3d Cir. 2019), is instructive. There, the district court's order was conditional "in effect" because it expressly granted certification based only on evidence "*at th[at] juncture*" of the case and "le[ft] unresolved conflicts in the evidence before it." *Id.* at 183-84. On Rule 23(f) review, the Third Circuit reversed, explaining that such a conditional order "cannot be permitted." *Id.* at 184. The court saw fit to grant interlocutory review to emphasize that point even though Supreme Court and circuit precedent already established that conditional certification is inappropriate. *Id.* at 182-85. The same should happen here.

*Second*, the district court manifestly erred in concluding that issues affecting the weight and persuasiveness of Plaintiffs' expert testimony were irrelevant for class-certification purposes. Like many defendants opposing class certification, Apple raised two distinct sets of arguments: one about the admissibility of Plaintiffs' expert testimony under Rule 702 (Dkt. 688-1), and the other about how weaknesses in that testimony made certification inappropriate (Dkt. 688-2 at 10-23). The district court rejected the first set of

16

arguments as going only "to weight, not admissibility," Order 8, 15, 20, and disposed of the second in a footnote referring back to its admissibility analysis, *id.* at 24 n.18.

That shortcut replicates the error this Court corrected over a decade ago in *Ellis*, 657 F.3d 970. Under Rule 702, courts do not exclude evidence "based on its persuasiveness." *Id.* at 982. But under Rule 23's "'rigorous analysis' standard," weight and persuasiveness *do* matter—a court must "examin[e] the merits" of the parties' respective expert evidence. *Id.* at 982-84. A court thus may not "end its analysis of the plaintiffs' evidence after determining such evidence was merely admissible." *Id.* at 982.

If there were any doubt on the point, *Olean* would dispel it. At least fifteen pages of that decision are devoted to "weighing conflicting expert testimony and resolving expert disputes" in order "to ensure that Rule 23(b)(3)'s requirements are met." 31 F.4th at 666, 670-84 (cleaned up). But under the approach reflected in the certification order here, all that analysis would have been unnecessary; this Court need only have noted that the plaintiffs' expert testimony was admissible under Rule 702. The Court should intervene to

17

underscore that Rule 23's demands do not take a backseat when it comes to battles of the experts that affect class certification.

*Third*, the district court embraced an arbitrary redefinition of the class that fails to heed this Court's warnings in *Olean*. Without that redefinition, Plaintiffs' model would have shown *over thirty million* (as many as 20% of all) Apple ID accounts as uninjured. Dkt. 679-1 at 31-32, 39. The district court previously recognized that figure was unprecedented. *See* Dkt. 630 at 24-25. Plaintiffs' proposal to minimize the problem was to limit the class to users with $10 or more in App Store spending, Order 25, jettisoning over 25 million accounts deemed injured by Plaintiffs' model, Dkt. 688-5 at 82 n.261. The district court accepted Plaintiffs' proposal, citing *Olean* for the proposition that courts should redefine classes where possible to avoid "'fatally overbroad'" classes containing uninjured members. Order 25-26 (quoting 31 F.4th at 669 n.14).

Nothing in *Olean* suggests that plaintiffs seeking class certification can avoid a serious overbreadth problem—and the rigorous analysis Rule 23 demands—with an arbitrary cutoff bearing no logical relationship to their underlying theory of liability. To the

18

contrary, *Olean* made clear that class redefinitions must be designed to isolate those members who "can rely on the same body of common evidence to establish the common issue." 31 F.4th at 669 n.14. The $10 cutoff here does not qualify. It is a crude made-for-litigation change—a hacksaw, not a scalpel—that Plaintiffs engineered so they could claim that the percentage of uninjured accounts reflected in their model was in the single digits.

Because the $10 cutoff is purely intended to remove uninjured members from the class and thereby preserve Plaintiffs' model as the arbiter of class injury, it is much like the sort of fail-safe class—i.e., one designed "to include only those individuals who were injured by the allegedly unlawful conduct"—about which *Olean* warned. 31 F.4th at 669 n.14. Both precedent and basic principles of fairness hold that defendants ought not face a situation in which "a class member either wins or, by virtue of losing, is defined out of the class and is therefore not bound by the judgment." *Id.*

The district court wrote that *Olean* endorsed certification even though "up to 28% of the class was uninjured," which was "significantly more than" under Plaintiffs' model. Order 26. But *Olean*

19

expressly rejected the defendants' (and the dissent's) contention that 28% of the class was potentially uninjured, 31 F.4th at 680-81, and instead held that the plaintiffs' expert and non-expert "evidence was capable of establishing antitrust impact on a class-wide basis" and that they had "adequately demonstrated Article III standing at the class certification stage for *all class members*," *id.* at 682 (emphasis added).

This case is the opposite. The district court itself recognized that Plaintiffs have not yet produced a model that can "successfully ascertain the number of uninjured class members and limit them." Order 27-28. The class here is thus one "in which any class member may be uninjured," and there are millions "who in fact suffered no injury." *In re Asacol Antitrust Litig.*, 907 F.3d 42, 53-54 (1st Cir. 2018). "[T]he need to identify" those members "'will predominate and render an adjudication unmanageable.'" *Olean*, 31 F.4th at 669 n.13 (quoting *Asacol*, 907 F.3d at 53-54).

\*     \*     \*

This Court granted review in *Google Play* to clarify "what th[e] rigorous analysis" called for in *Olean* demands in practice. No. 22-

20

80140, Dkt. 1-2 at 9. But the Court was unable to provide that guidance after the district court decided it would decertify the class and mooted the appeal on the eve of argument. No. 23-15285, Dkt. 123. The manifest errors in the certification order here show that the guidance the Court was set to provide in *Google Play* remains necessary.

## II.  This Court Should Clarify That No Class Can Be Certified Based on an Expert Model That Masks Individualized Issues Necessary to Determine Whether Class Members Are Injured.

Rule 23(f) review is also warranted because the district court certified a class based on a flawed expert model that cannot show classwide injury and conflicts with real-world evidence. Plaintiffs' model stands in for an intricate web of decisions made by thousands of developers of millions of apps, all of which affect whether any consumer actually paid more because of Apple's conduct. *Olean* recognized that expert models can satisfy Rule 23 to the extent they account for "independent or explanatory variables" "that could affect the price." 31 F.4th at 671. But *Olean* left open whether issues "undercut[ting] the model's reliability (such as unsupported assumptions, erroneous inputs, or nonsensical outputs such as false positives)"

21

preclude a model from "showing class-wide antitrust impact." *Id.* at 683; *see id.* at 666 n.9. That question is another the Court was poised to decide in *Google Play*, and it is squarely presented here.

Below, Apple introduced evidence revealing that Plaintiffs' model cannot reliably predict the prices developers would have set if Apple's commission rates had been lower. The strongest indication comes from three natural experiments—i.e., what actually happened when Apple reduced its commission rates for subscription renewals, small business apps, and video-streaming services. These events enabled a true apples-to-apples comparison of Plaintiffs' model, in that its predictions about app prices could be compared to how prices for the same apps responded in the real world to the same commission reduction at the same point in time. Dkt. 740-2 ¶¶ 4-9.

The gulf between Plaintiffs' model and real-world data is wide. Plaintiffs' model predicted that over 66% of small business apps would reduce in-app purchase prices at a 15% rate and only 1% would keep prices the same. But in the real world, when Apple cut its commission to 15% for those same tens of thousands of small developers, only 2.9% of their apps reduced prices, and more than 90%

kept prices the same. Dkt. 688-3 ¶¶ 108-13 & fig.11; *see also id.*
¶ 114 & fig.12. Similar tests run on subscriptions and video-stream-
ing apps likewise showed, contrary to the model's predictions, that
when Apple reduced the commission rate charged to such apps, most
developers did *not* change prices and that those who did were more
likely to *increas*e prices than decrease them. *Id.* ¶¶ 118-22, 125-28.
These comparisons disprove Plaintiffs' prediction that almost all
prices would decrease if Apple lowered its commission rate. *Id.* ¶¶ 42,
102-04, 129.

As courts have explained in similar cases, a "damages model's
propensity toward false positives" casts doubt on whether the pre-
dictions of injury "are any more accurate than [its] obviously false
estimates," which in turn can "shred the plaintiffs' case for [class]
certification." *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725
F.3d 244, 252, 254 (D.C. Cir. 2013); *accord In re Interest Rate Swaps
Antitrust Litig.*, 2023 WL 8675625, at *6-9 (S.D.N.Y. Dec. 15, 2023).
*Olean* recognized that very point, acknowledging a model's "nonsen-
sical outputs such as false positives" can render expert evidence "in-
adequate" under Rule 23. 31 F.4th at 666 n.9, 683. That Plaintiffs'

model produced false positives on a massive scale was thus a clear red flag.

The certification order does not reflect the rigorous analysis that Rule 23 requires and that *Olean* envisioned regarding whether the widespread false-positive predictions made the model incapable of identifying injured class members. The only analysis of those issues was that they went to "weight, not admissibility," Order 8—but as *Ellis* and *Olean* instruct, the weight of and defects in expert testimony are exactly what matters when it comes to Rule 23. *See supra* at 16-18.

The district court credited Apple's evidence that "prices mostly stayed the same" when rates dropped, but it concluded that this real-world evidence was irrelevant to the Rule 23 inquiry on the ground that "a hypothetical question"—like whether prices would fall if commission rates were lower—"cannot be answered by historical data about what actually happened but must often be answered by general principles about what generally tends to happen." Order 8-9. In economics, however, "what actually happened" is often the best indicator of "what generally tends to happen." That is why

24

econometricians routinely test their hypotheses against real-world data, Dkt. 688-3 at 55 n.119—including natural experiments, which Plaintiffs' own expert calls "the most persuasive econometric studies," Dkt. 691-16 at 3-4.

Plaintiffs argued below that they had no obligation to test their model "against real data in any way, shape, or form." Dkt. 736 at 41-42. That ostrich-like approach is incompatible with *Olean*, which demands that courts resolve disputes between parties' experts about whether a model actually "yield[s] false positives" with reference to "economic observation[s]" and "analysis of the . . . market." 31 F.4th at 674-76. And as the Supreme Court has made clear, a court cannot accept a model "no matter how arbitrary" simply because it could apply classwide. *Comcast Corp. v. Behrend*, 569 U.S. 27, 36 (2013). By accepting a model without rigorously analyzing whether it was a defensible way to prove injury across the class, the district court "reduce[d] Rule 23(b)(3)'s predominance requirement to a nullity." *Id.*

This case underscores the need for further guidance after *Olean* in additional ways. This Court has explained that district courts must scrutinize whether a model properly accounts for real-

25

world "variables . . . that could affect the price" that would have been charged absent the alleged anticompetitive conduct. *Olean*, 31 F.4th at 666 n.9, 671, 683. There are many such factors here—of which focal-point pricing and marginal costs are just two. *See* Dkt. 688-3 ¶¶ 43-44. Plaintiffs' failure to reliably account for these variables almost certainly explains why the model's price predictions bear no resemblance to reality. *Id.* ¶¶ 130-35. But here, the district court declined to weigh the conflicting evidence on these issues. Its ruling contravenes not only *Olean*, but also decisions of many courts in this Circuit, which further underscores the need for review.

***99-cent pricing.*** Any consumer knows that prices bunch at points ending in 99 cents. The same goes for apps and in-app purchases. In the real world, apps and most in-app purchases are set to 99-cent price points; so even if Apple lowered its commission, individual developers would be unlikely to drop their prices by a few cents to an amount that does not end in 99 cents, which in turn would mean purchasers would suffer no injury. Dkt. 688-3 ¶¶ 184-90. Plaintiffs below recognized this dynamic, positing that 99-cent prices may explain why "many developers did not respond" to changes in

26

Apple's commission rates. Dkt. 702-1 at 8. And Apple's experts showed that if forced to predict prices ending in 99 cents, the model predicts almost *four times as many* unharmed accounts, even within the truncated $10-or-more-spent class. Dkt. 688-5 ¶ 131-32.

The district court initially recognized the importance of 99-cent price points to determining classwide injury, crediting Apple's "over-whelming" evidence that developers would set 99-cent prices regardless of Apple's conduct and excluding Plaintiffs' model for "fail[ing] to incorporate such pricing." Dkt. 630 at 11-12. The second time around, the model still "d[id] not predict in-app prices ending at 99 cents," but this time the court concluded that feature of Plaintiffs' model was "no surprise." Order 11. The court apparently reached that conclusion without considering Apple's expert evidence establishing that 99-cent price points are the norm for digital goods and would be expected in any but-for world. *See id.* at 6 n.2 (omitting Apple's expert report on 99-cent prices from those the district court reviewed); Dkt. 688-7 (Apple's expert report on 99-cent prices).

The district court's analysis conflicts not only with its prior ruling, but also with several decisions denying certification because

27

models of consumer antitrust injury neglected 99-cent price points. *See In re Lithium Ion Batteries Antitrust Litig.*, 2018 WL 1156797, at *3-5 (N.D. Cal. Mar. 5, 2018) (failure to explain "the effect of focal point pricing on the pass-through analysis" precludes finding that "antitrust injury . . . can be determined on a common basis"); *In re Optical Disk Drive Antitrust Litig.*, 303 F.R.D. 311, 324-25 (N.D. Cal. 2014) (similar).

***Low marginal costs.*** Plaintiffs' model also does not properly account for another variable affecting price: developers' marginal costs. Marginal costs are what a developer incurs to produce one more unit, which here means one more digital transaction. Dkt. 688-10 at 153. They are critical to Plaintiffs' model because the model must infer developers' costs to predict what prices they would set at a different commission rate. Dkt. 688-5 ¶¶ 33-36.

Every developer's costs are different, but Plaintiffs' model assumes that as app and in-app purchase prices rise, costs do too. In other words, under the model, low-priced products must have low marginal costs, and high-priced products must have high marginal costs. Dkt. 688-5 ¶¶ 21-23, 75-87. Plaintiffs' expert admitted that

28

assumption was untested, Dkt. 688-10 at 174—and it cannot be squared with real-world evidence.

For digital software, marginal costs are "virtually zero" regardless of the price. *United States v. Microsoft Corp.*, 56 F.3d 1448, 1452 (D.C. Cir. 1995); *accord* Dkt. 688-3 ¶¶ 143-54, 180-83. Take Epic's game, *Fortnite*. It costs nothing for Epic to produce one more unit of *Fortnite*'s V-Bucks, the currency it sells to its users, as the company's CEO testified at trial. Dkt. 688-5 ¶ 72 & n.142. But Plaintiffs' model not only assumes Epic's (and any developer's) marginal costs can *never* be zero, but also predicts absurdly high marginal costs for *Fortnite* of $24 per purchase. *Id.*

The consequences of that unfounded assumption are significant. Plaintiffs' expert agrees that a change in commission rate has *no effect* on app and in-app purchase prices when a developers' marginal costs are zero, leading to *no injury* on that transaction. Dkt. 688-10 at 193. Plaintiffs' assumption therefore has the effect of making consumers who bought those products and suffered no injury appear as though they had been harmed and were entitled to relief. *See* Dkt. 688-5 ¶¶ 80-87.

Below, Plaintiffs argued that these issues did not preclude certification because some apps do incur costs that increase with each transaction; music-streaming apps, for instance, pay royalties to artists. *See* Order 8. But those anecdotal examples do not change the fact that low-marginal-cost products are ubiquitous on the App Store. Dkt. 688-3 ¶¶ 146-47. The model has no way of identifying which developers' costs *are* zero, leaving individual developer-by-developer inquiry—which Plaintiffs have never suggested could be performed in a manageable class trial—as the only way to reliably predict injury to consumers.

After *Olean*, district courts have disagreed as to when a model's "unsupported assumptions" about individualized factors bearing on injury—like developers' marginal costs here—make a model incapable of showing that class members were injured. 31 F.4th at 666 n.9, 683. In fact, in *Google Play*, it was the plaintiffs' expert's "unproven assumptions" that "fl[ew] in the face of the huge diversity of apps" in the store that led to decertification. *In re Google Play Store Antitrust Litig.*, 2023 WL 5532128, at *5-9 (N.D. Cal. Aug. 28, 2023). That the district court here took the opposite tack supports Rule 23(f) review.

30

## CONCLUSION

The Court should grant review under Rule 23(f).


Dated:  February 16, 2024                    Respectfully submitted,

                                             /s/ Theodore J. Boutrous Jr.
                                                Theodore J. Boutrous Jr.

                                             *Counsel for Petitioner*
                                             *Apple Inc.*

## CERTIFICATE OF COMPLIANCE

This petition complies with the word limit of Circuit Rules 5-2(b) and 32-3(2) because it contains 5,594 words, excluding the portions exempted by Federal Rules 5(b)(1)(E) and 32(f) and Circuit Rule 5-2(b). The petition complies with the typeface and type-style requirements of Federal Rules 32(a)(5)(A) and (6) because it has been prepared using Microsoft Word in 14-point, New Century Schoolbook font.

Dated: February 16, 2024

Respectfully submitted,

/s/ Theodore J. Boutrous Jr.
Theodore J. Boutrous Jr.

*Counsel for Petitioner*
*Apple Inc.*

## CERTIFICATE OF SERVICE

I certify that on February 16, 2023, I electronically filed the foregoing petition with the Clerk of Court for the U.S. Court of Appeals for the Ninth Circuit using the ACMS system. On the same day, I caused the petition to be served by email and by commercial carrier for next-day delivery on counsel for plaintiffs-respondents:

Betsy C. Manifold
  manifold@whafh.com
Rachele R. Byrd
  byrd@whafh.com
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, CA 92101

Mark. C. Rifkin
  rifkin@whafh.com
Matthew M. Guiney
  guiney@whafh.com
Thomas H. Burt
  burt@whafh.com
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
270 Madison Ave
New York, NY 10016

David C. Frederick
  dfrederick@kellogghansen.com
Aaron M. Panner
  apanner@kellogghansen.com
Kyle M. Wood
  kwood@kellogghansen.com
KELLOGG, HANSEN, TODD, FIGEL &
  FREDERICK, P.L.L.C.
1615 M. Street, NW, Suite 400
Washington, DC 20036

33

Dated:  February 16, 2024          Respectfully submitted,

                                   /s/ Theodore J. Boutrous Jr.
                                     Theodore J. Boutrous Jr.

                                   *Counsel for Petitioner*
                                   *Apple Inc.*

United States District Court<br>Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

Case No. 4:11-cv-6714-YGR

**ORDER**
**DENYING APPLE'S *DAUBERT* MOTION TO EXCLUDE THE TESTIMONY OF PROFESSOR DANIEL L. MCFADDEN AND DR. ROSA ABRANTES-METZ; AND**

**GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION**

Re: Dkt. Nos. 683, 690, and 786

**IN RE APPLE IPHONE ANTITRUST LITIGATION**

Pending before this Court is the Renewed Motion for Class Certification filed by plaintiffs Robert Pepper, Stephen H. Schwartz, Edward W. Hayter, and Edward Lawrence ("consumer plaintiffs"), a *Daubert*[1] motion to exclude the testimony of Professor Daniel L. McFadden and Dr. Rosa Abrantes-Metz filed by defendant Apple, Inc., and an Omnibus Motion to Seal which will be addressed by separate order. Though the Court previously denied in part plaintiffs' motion for class certification, it noted that it expected that plaintiffs could fix the identified problems with their expert's econometric model. At this juncture, plaintiffs have resolved those deficiencies. The Court, therefore, **GRANTS** the renewed motion for class certification and **DENIES** Apple's *Daubert* motion.

Given the procedural posture of this motion, the Court accepts plaintiffs' representation that Professor McFadden can: (i) match the Apple identification numbers he has with *actual consumers* to ascertain class members, and (ii) limit the percentage of unharmed class members swept in by the narrowed class definition. Should Professor McFadden's model fail to do both, the Court will consider whether modification or decertification is appropriate for all or part of the class. *See City of Los Angeles, Harbor Division v. Santa Monica Baykeeper*, 254 F.3d 882, 885 (9th Cir. 2001) (holding that a district court is free to "reconsider, *rescind*, or modify an

---

[1] *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589–90 (1993).

1    interlocutory order" such as certification of a class "for cause by it seen to be sufficient" (emphasis

2    supplied)).

3    **I.      BACKGROUND**

4         **A.      FACTUAL BACKGROUND**

5         The facts of this case are well known to the parties. The background relevant to the instant

6    motion is summarized as follows:

7         Consumer plaintiffs bring this class action pursuant to Section 2 of the Sherman Antitrust

8    Act of 1890, 15 U.S.C. § 2, on behalf of the following class:

9         All persons in the United States, exclusive of Apple and its employees, agents and
         affiliates, and the Court and its employees, who purchased one or more iOS
10        applications or application licenses from Defendant Apple Inc. ("Apple"), or who
         paid Apple for one or more in-app purchases, including, but not limited to, any
11        subscription purchase, for use on an iOS Device at any time since July 10, 2008
         (the "Class Period"). The Class is limited to those persons who paid more than
12        $10.00 in total to Apple during the Class Period for iOS application and in-app
         purchases from any one Apple ID account.
13

14   (Dkt. No. 666-1, Renewed Motion for Class Certification, "Mot." at 1.) Consumer plaintiffs

15   theorize that Apple charges developers on the App Store supracompetitive commissions, which

16   the developers then pass to consumers in the form of increased prices for app downloads or

17   subscriptions.  (Dkt. No. 228, Third Amended Complaint, ¶ 47.) Consumer plaintiffs allege that

18   this conduct allows Apple to unlawfully monopolize the retail market for the sale of apps,

19   including in-app purchases ("IAP").

20        Consumer plaintiffs bring two causes of action against Apple based on this alleged

21   conduct: (1) unlawful monopolization of the applications aftermarket in violation of Section 2 of

22   the Sherman Act and (2) attempted monopolization of the applications aftermarket.  (*Id*. ¶¶ 78–

23   88.)

24        **B.      PROCEDURAL BACKGROUND**

25             **1.      PREVIOUS *DAUBERT* MOTION**

26        In its previous order, the Court granted in part and denied in part Apple's *Daubert* motion

27   to exclude Professor McFadden's expert opinion and denied without prejudice consumer

28   plaintiffs' motion for class certification. (Dkt. No. 630, "Previous Order.") With respect to the

     *(left margin)* United States District Court
     Northern District of California

                                             2

*Daubert* motion, Apple challenged several aspects of Professor McFadden's econometric model. The Court examined these challenges systematically.

First, it denied Apple's motion as to Professor McFadden's overarching model. Apple argued that Professor McFadden's econometric model was meant not to test whether Apple's allegedly anticompetitive conduct had a common impact on class members but to prove it. (*Id.* at 3.) The Court disagreed, finding that Professor McFadden relied on sound scientific and economic principles to determine that Apple's commission rate on developers acts as a tax for both developers and their consumers. (*Id*. at 4.)

Next, the Court denied Apple's motion as to Professor McFadden's market definition. (*Id.* at 5.) Professor McFadden opined that there was a single relevant aftermarket for selling iOS apps and in-app content to consumers.  Apple argued that he had ignored the two-sidedness of the App Store. (*Id.*) The Court found that, under *Daubert*, the bases of Professor McFadden's market definition were sound. It declined to address the merits question of whether Professor McFadden's market definition was correct because, traditionally, market definitions are highly factual, and frequently the focus of any trial.

 Finally, the Court ruled on Apple's challenges to Professor McFadden's three-step approach to quantifying the impact and damages of Apple's allegedly anticompetitive conduct. In step one, Professor McFadden identified the but-for commission rate—the commission rate that would exist but for Apple's monopolistic practices. The Court rejected Professor McFadden's but-for commission rate as arbitrary, finding that Professor McFadden was not an expert in the relevant fields nor was his conclusion the product of legitimate economic inquiry.

In the second step, Professor McFadden estimated the app and in-app prices that consumers would have paid in the but-for world. Apple challenged Professor McFadden's pricing model on five grounds:

1.      The model initially forecasted that about 5.8% of Apple accounts were uninjured. In other words, the model forecast that plaintiffs' proposed class included many accounts who were not harmed by Apple's allegedly anticompetitive conduct. Largely due to errors identified by Apple's experts, Professor McFadden later

United States District Court
Northern District of California

United States District Court
Northern District of California

1    conceded that the model actually included 14.6% uninjured accounts.

2.   Professor McFadden also conceded that, at the time of decision, he had not fixed
     one of these errors—the use of fixed-dollar rather than percentage pricing, which at
     times created negative but-for prices. Given this concession, and the fact that the
     parties did not dispute that fixing the model to reflect percentage pricing would fix
     the problem, the Court rejected Apple's argument that Professor McFadden's
     model otherwise generated negative but-for prices.

3.   The Court did find that Professor McFadden's opinion that Apple's focal-point
     pricing and pricing tiers would not exist in the but-for world lacked foundation and
     ignored overwhelming evidence to the contrary.

4.   Apple argued that Professor McFadden's model was not sufficiently robust for
     three reasons—the sample size was too small; the model easily allowed for
     accounts to switch from harmed to unharmed; and it estimated a wide variation of
     unharmed accounts depending on the sample size. The Court found that Professor
     McFadden had sufficiently supported his use of a 0.1% sample size. Given that the
     model required adjustment, the Court granted Apple's motion as to the robustness
     of Professor McFadden's model without ruling on its other arguments. The Court
     did, however, order plaintiffs to address the confidence level of the model in the
     next round of briefing.

5.   Apple contended that Professor McFadden's decision to exclude free apps from his
     model ignored market realities. Because free apps were excluded from Professor
     McFadden's impact calculations and the proposed class definition, the Court
     rejected Apple's argument.

In the third and final step, Professor McFadden proposed a method for separating harmed
from unharmed class members. Though the Court found that the method of identifying the class
members—matching Apple IDs to actual customers through Apple's internal records—was
sufficiently objective, plaintiffs' approach with respect to timing was unacceptable. The Court
advised plaintiffs that it could not wait until *after trial* to ascertain which class members were

4

1    uninjured. While perhaps acceptable in a settlement context, plaintiffs had no legal basis for

2    addressing a core merits issue after trial.

3        Ultimately, the Court granted plaintiffs leave to amend their expert's report and noted that

4    it expected that many of the identified issues could be fixed.

5                          **2.    PREVIOUS CLASS CERTIFICATION MOTION**

6        The Court also analyzed plaintiffs' class certification motion and found that plaintiffs met

7    all the Rule 23(a) requirements.

8        Four common questions capable of class-wide resolution existed. First, the relevant

9    market. Plaintiffs proffered Professor McFadden's definition of the market: a single aftermarket of

10    the sale of iOS apps and in-app content. Apple criticized this definition, arguing that the relevant

11    market was a two-sided transaction platform. The Court found that, for purposes of class

12    certification, Professor McFadden's opinion on the market definition constituted common proof,

13    though it declined to rule on its merits. The Court also found that Professor McFadden put forth

14    common proof that could resolve the question of Apple's power in the market, its willfulness in

15    acquiring and maintaining a monopoly, and whether it had violated Section 2 of the Sherman Act

16    by monopolizing the market for iOS apps and in-app content.

17        Without Professor McFadden's methodology, many of the same issues addressed in the

18    *Daubert* context led the Court to find that plaintiffs could not meet the predominance requirement

19    of Rule 23(b)(3). Plaintiffs had not shown that the impact or damages of Apple's allegedly

20    anticompetitive conduct could be proven on a classwide basis. With respect to antitrust impact,

21    because Professor McFadden's methodology could not then reliably ascertain how many class

22    members were unharmed by Apple's allegedly anticompetitive conduct, individual questions

23    would predominate. With respect to antitrust damages, the Court rejected plaintiffs' proffer that

24    they would run Professor McFadden's model after trial to determine classwide damages as too

25    speculative.

26                                        * * *

27        Since the Previous Order, plaintiffs have filed a revised supplemental expert report by

28    Professor McFadden. They also filed a new expert report by Dr. Rosa Abrantes-Metz, an expert in

United States District Court
Northern District of California

                                            5

Case 4:11-cv-06714-YGR   Document 789   Filed 02/02/24   Page 6 of 28

United States District Court
Northern District of California

1   econometrics, statistics, transaction pricing, and payment processing, to calculate anew Apple's

2   but-for commission rate. Based on those expert reports, plaintiffs renewed their motion for class

3   certification. Apple then moved to exclude the new testimony of both of plaintiffs' experts and

4   opposed the renewed motion for class certification.

5   **II.   *DAUBERT* MOTION**

6           Because the Court's *Daubert* analysis informs the rest of its decision, the Court begins

7   there. It then proceeds to analyze plaintiffs' renewed motion for class certification.[2]

8           A.   LEGAL FRAMEWORK

9   Federal Rule of Evidence 702[3] provides:

10          A witness who is qualified as an expert by knowledge, skill, experience, training, or
            education may testify in the form of an opinion or otherwise <u>if the proponent</u>

11          <u>demonstrates to the court that it is more likely than not that:</u>
            (a) the expert's scientific, technical, or other specialized knowledge will help the

12          trier of fact to understand the evidence or to determine a fact in issue;
            (b) the testimony is based on sufficient facts or data;

13          (c) the testimony is the product of reliable principles and methods; and
            (d) the <u>expert's opinion reflects a reliable application of</u> the principles and methods

14          to the facts of the case.

15          At the class certification stage, "the relevant inquiry is a tailored *Daubert* analysis which

16

17          _____

18          [2] The Court references various reports from plaintiffs as follow: Professor McFadden's
     Opening Report from June 1, 2021 (Dkt. No. 443-14, "McFadden's Opening Report"); Professor

19   McFadden's Reply Report from October 19, 2021 (Dkt. No. 554-5, "McFadden's Reply Report");
     Professor McFadden's Second Revised Supplemental Report (Dkt. No. 679-1, "McFadden's 2nd

20   Supplemental Report"); Professor McFadden's Second Reply Report from April 28, 2023 (Dkt.
     No. 708-2, "McFadden's Second Reply Report"); and Professor McFadden's Declaration (Dkt.

21   No. 702-2, "McFadden's Decl.").

22          For Dr. Abrantes-Metz there are: Dr. Abrantes-Metz's Opening Report from September 26,
     2022 (Dkt. No. 666-2, "Dr. Abrantes-Metz's Opening Report"); Dr. Abrantes-Metz's Reply

23   Report from April 28, 2023 (Dkt. No. 708-3, "Dr. Abrantes-Metz's Reply Report"); and Dr.
     Abrantes-Metz's Declaration (Dkt. No. 702-3, "Dr. Abrantes-Metz's Decl.").

24          For Apple's experts, there are: Professor Jeffrey T. Prince's Report from March 10, 2023
     (Dkt. No. 668-5, "Prince Report"); Professor Lorin M. Hitt's Report from March 10, 2023 (Dkt.

25   No. 688-3, "Hitt Report"); Professor Mark Watson's Report from March 10, 2023 (Dkt. No. 688-
     6, "Watson Report"); and Professor Richard Schmalensee's Report from March 10, 2023 (Dkt.

26   No. 688-4, "Schmalensee Report").

27          [3] The Supreme Court updated the rule effective December 1, 2023. The changes are
     underlined.  *See* https://www.supremecourt.gov/orders/courtorders/frev235468.pdf.  The new

28   language does not change the intent of the rule, rather it provides further clarity.

6

scrutinizes the reliability of the expert testimony in light of the criteria for class certification and the current state of the evidence." *Rai v. Santa Clara Valley Transportation Auth.*, 308 F.R.D. 245, 264 (N.D. Cal. 2015); *Grodzitsky v. Am. Honda Motor Co.*, 957 F.3d 979, 985–86 (9th Cir. 2020). "Ultimately, the test under *Daubert* is not the correctness of the expert's conclusions but the soundness of [their] methodology." *Elosu v. Middlefork Ranch Inc.*, 26 F.4th 1017, 1024 (9th Cir. 2022) (quotation marks and citation omitted).

### B.   PROFESSOR MCFADDEN'S CHALLENGED OPINIONS

Apple submits that Professor McFadden has failed to fix the deficiencies in his model identified by the Court in its Previous Order. Plaintiffs disagree. The Court analyzes each argument.

#### 1.   METHODOLOGY

Apple challenges Professor McFadden's methodology on: (a) marginal costs; (b) in-app purchase prices; (c) price tiers and focal prices; and (d) developer competition.

##### a.   MARGINAL COSTS

First, Apple argues Professor McFadden's model overestimates marginal costs. Even though, according to Apple, it is "textbook economics that digital goods have low or zero marginal costs," Apple believes the model is engineered to find positive marginal costs for every app and in-app purchase which leads to overestimation of marginal costs. Apple supports this position by pointing to the "natural experiments" its experts ran on the model.

The Court disagrees. Apple misconstrues Professor McFadden's model; in it, marginal cost is calculated based on app developers' "*variable* costs." (McFadden's Opening Report ¶ 185 (emphasis in original).) Professor McFadden defines a "variable cost" as an expense that "varies in proportion to production output." (*Id.* ¶ 185; *see also* McFadden's Decl. ¶ 5.) In other words, when Professor McFadden posits that app developers have marginal costs, he is looking at how costs change not when producing one additional unit of a digital good but when operating at scale. (McFadden's Reply Report ¶¶ 73–74.) So, for example, when Professor McFadden states that Fortnite incurs marginal costs, he is not talking about the marginal cost of creating one more unit of its digital currency, "V-bucks," but "all of the different variable costs that come along with [its]

United States District Court
Northern District of California

1    iOS app monetization business." (*Id.* ¶ 74.)

2        Moreover, Professor McFadden provides examples of positive variable costs. (McFadden's

3    Opening Report ¶¶197–208.) User acquisition costs, for example, tend to rise with revenue,

4    suggesting that they are variable, rather than fixed, costs. (*Id.* ¶ 198.) Streaming costs are another.

5    (*Id.* ¶ 201.) When a user streams a song on Spotify, for example, Spotify pays a royalty fee. (*Id.*

6    ¶ 206.) Apple does not address either example of positive variable cost but at least one of Apple's

7    experts, Professor Hitt, conceded when presented with such examples that marginal costs could be

8    "meaningful." (McFadden's Reply Report ¶ 73 n.138.)

9        Lastly, Apple argues that its experts' "natural experiments" undermine how Professor

10   McFadden computed marginal costs. Apple has lowered its commission rate three times. (Hitt

11   Report ¶ 41.) Each time it did, prices mostly stayed the same. Apple extrapolates that such a result

12   shows that in a digital marketplace "products have zero or negligible marginal cost."[4] By way of

13   illustration, Professor Hitt proffers Apple's Small Business Program ("SBP"), introduced in

14   December 2020. (*Id.* ¶ 55.) The SBP reduced Apple's commission rate to 15% for paid

15   transactions for app developers who earned less than or equal to $1 million in net proceeds. (*Id.*)

16   The program was voluntary. Professor Hitt then analyzed whether app developers who

17   participated in the program lowered their prices in response by comparing what their prices were

18   six months before the program and six months after. (*Id.* ¶ 56.) Professor Hitt concluded that most

19   participants did not reduce their prices.

20       At most, Professor Hitt's conclusions on the natural experiments go to weight, not

21   admissibility. The "test under *Daubert* is not the correctness of the expert's conclusions but the

22   soundness of his methodology." *Daubert,* 43 F.3d at 1318. Apple's analysis of Professor Hitt's

23   natural experiments say nothing about Professor McFadden's methodology; instead, they articular

24   a different perspective on what would have happened in the but-for world. That perspective does

25   _____

26       [4] Apple also states that, in a deposition, Professor McFadden admits that he did not test his
     model against these natural experiments. That is not what Professor McFadden said. In response to
27   the question of whether he thought that "it is likely that marginal costs, as you estimate them,
     would change at the exact same time as a change in the commission rate," Professor McFadden
28   responded he had not "examined" that particular issue. (McFadden 3d Deposition at 160:15–23.)

United States District Court
Northern District of Califoria

8

1   not discredit Professor McFadden's testimony about how all app developers across the App Store

2   would have priced their apps and in-app content had Apple's commission rate always been

3   13.63% rather than 30%. "The question of what would have happened but for [defendant's]

4   monopoly overcharge is a hypothetical, and a hypothetical question generally cannot be answered

5   by historical data about what actually happened but must often be answered by general principles

6   about what generally tends to happen." *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D.

7   583, 605 (N.D. Cal. 2010) (internal citation and quotations omitted); *see also In re Lithium Ion

8   Batteries Antitrust Litig.*, 2017 WL 1391491, at *11 (N.D. Cal. Apr. 12, 2017) ("Determination of

9   the difference between prices paid and prices that would have been paid 'but-for' the unlawful

10  conduct is necessarily hypothetical.")

11      Professor McFadden has demonstrated that calculating marginal costs at the app, rather

12  than individual item, level is reliable.[5] For that reason, the motion on this ground is **DENIED.**

13                          **b.    IN-APP PURCHASE PRICES**

14      Apple next argues that Professor McFadden's model cannot predict what individual in-app

15  purchase prices would be but for Apple's allegedly anticompetitive conduct and therefore cannot

16  reliably calculate damages. (*See* McFadden's 2nd Supplemental Report ¶ 42.)

17      As explained in its Previous Order, the Court understands that Professor McFadden

18  calculates prices at the "app level" rather than the "individual app purchase level." (Previous

19  Order at 10.) He does so because he opines that app developers consider costs at the app level

20  when setting prices. (*Id.*). Thus, when he built his model, Professor McFadden averaged the prices

21  of all in app content in an app, per month. (*Id.*) He then calculated the but-for prices at the *app*

22  level to estimate damages. (McFadden's 2nd Reply Report ¶ 108.) The Court declined in the

23  previous round of briefing to exclude Professor McFadden's model because he calculates but-for

24  prices at the app, rather than individual, level and it will not revisit that decision here.

25      Apple next challenges Professor McFadden's use of the "percentage method" to estimate

26

27      ──────────

28      [5] As Professor Prince acknowledged, "economists think about short run and long run."
(Dkt. No. 702-5, 2023 Prince Dep. 70:15.) The perspective of the analysis, therefore, is "going to
impact how [economists] think about [costs] being variable or marginal." (*Id.*)

United States District Court
Northern District of California

1    damages. In its Previous Order, the Court excluded Professor McFadden's model because it

2    generated negative but-for prices. The parties then agreed the issue could be fixed if Professor

3    McFadden applied the percentage rather than fixed-dollar method. (Previous Order at 11.)

4    Professor McFadden now uses the percentage method to estimate damages. (McFadden's 2nd

5    Supplemental Report ¶ 40.)

6         Apple now argues that even though Professor McFadden applies the percentage method, he

7    changes the price of every as-is in-app item by the same percentage to calculate the but-for price, a

8    method that is scientifically unsound. The Court disagrees with Apple's characterization. As

9    Professor McFadden states, he uses "the percentage method to estimate damages for each

10   transaction, not to *predict* item level prices." (McFadden's 2nd Supplemental Report ¶ 37.)

11   Instead, he calculates how much Apple overcharged consumers as a percentage of its total

12   revenues. (*Id.* ¶ 40.) Professor McFadden then calculates individual damages by taking this

13   percentage and multiplying it against each individual's spending on a particular app, in a particular

14   month. (*Id.* ¶ 41.) To illuminate, Professor McFadden gives the example of two users, one who

15   spends $0.99 on an app, the other $9.99. (*Id.* ¶ 41.) Using Dr. Abrantes-Metz's but-for

16   commission rate of 13.63%, Professor McFadden concluded that Apple's overcharge for that

17   particular app was 35.5% in January 2018. (*Id.*) At the as-is commission rate of 30%, Apple's

18   revenue from the first user was $0.297, for the second user $2.997. The users were therefore

19   overcharged by $0.105 (35.5% of $0.297) and $1.064 (35.5% of $2.997), respectively.

20        As now applied, the Court finds the percentage method sufficiently reliable. For that

21   reason, the motion on this ground is **DENIED.**

22                          **c.    PRICE TIERS AND FOCAL-POINT PRICING**

23        The Court previously excluded Professor McFadden's model because it ignored Apple's

24   price tiers and focal-point pricing. (Previous Order at 11–12.) Apple argues that Professor

25   McFadden's model still ignores the issue.

26        In their renewed motion for class certification, plaintiffs maintain their challenge to

27   Apple's price tiers. For that reason, Professor McFadden explains, he has created two models, one

28   without price tiers and one which incorporates tier and focal pricing. (McFadden's 2nd

                                         10

United States District Court
Northern District of California

1    Supplemental Report ¶ 85.) Professor McFadden conducts a simulation with Apple's current price

2    tiers, using the same 0.1% sample he uses generally to calculate damages. (*Id.* ¶ 87.) At the app-

3    level, Professor McFadden assumes that developers choose their app and average in-app content

4    prices consistent with the increments set out in Apple's tier schedules. (*Id.*) Within these

5    restrictions, Professor McFadden models that app developers set the prices that will result in

6    maximized profits. (*Id*.) In the same way, Professor McFadden's model demonstrates that it can

7    accommodate focal-point pricing. (*Id.* ¶ 88.) Professor McFadden acknowledges that, with the

8    current tier and focal pricing, the percentage of unharmed accounts is higher. (*Id.* ¶ 90.)

9         Professor McFadden then conducted a simulation using a more granular, 750-point pricing

10   structure. (*Id.* ¶ 93.) He did so because, as part of its settlement with app developers, Apple

11   announced that it would introduce such a pricing schedule. (*Id.* ¶ 94.) Using this more granular

12   pricing structure, Professor McFadden calculates that the percentage of unharmed accounts would

13   be similar to a but-for world with no pricing tiers. (*Id.* ¶ 95.)

14        The Court finds that Professor McFadden's tier and focal pricing simulation is sufficiently

15   reliable. Whether proof exists that pricing tiers or a pricing schedule is, in fact, anticompetitive is a

16   merits question not before the Court and likely reasonably in dispute in any event. That Professor

17   McFadden's does not predict in-app prices ending at 99 cents is no surprise. As explained,

18   Professor McFadden averages all in-app content prices, ending in 99 cents, at the app-level. He

19   then restricts the movement of these averaged prices to change in increments consistent with

20   Apple's pricing schedule. This approach, Professor McFadden explains, is consistent with how

21   one of Apple's experts, Professor Prince, originally calculated the effect of price tiers. (McFadden

22   2nd Reply Report ¶ 51.)

23        Further, as Professor McFadden explains, his model does reflect the impact of focal-

24   point pricing through Apple's current pricing structure and the 750-point structure that Apple has stated

25   it will implement. Professor Prince disputes this, arguing that Professor McFadden's model does

26   not reflect "voluntary focal-point pricing." (Prince Report ¶ 148.) In so arguing, Professor Prince

27   ignores that the analysis of price tiers and focal point pricing is "interchangeable." (McFadden's

28   2nd Reply Report ¶ 55.) In other words, whether the impact of a price restriction is analyzed as a

1  price tier—Apple requiring that all app prices end in $0.99—or as focal-point pricing—app

2  developers would freely choose to price at 99-cent points—the effect is the same. Apple does not

3  give the Court any reason to think otherwise.[6]

4      Finally, Apple's argument that Professor McFadden's model does not reflect the as-is

5  world because he assumes that app developers set prices to maximize profits exactly rather than

6  along one of Apple's price tiers does not persuade. Professor McFadden states that he simulates

7  the but-for world by assuming that developers choose the prices that yield them the highest profits

8  based on Apple's pricing schedule. (McFadden's 2nd Supplemental Report ¶ 87.) Moreover,

9  Professor McFadden's model incorporates actual transaction data from the App Store, which

10  already reflects Apple's pricing restrictions. Nothing further is required.

11      On that ground, Apple's motion is **DENIED.**

12              **d.   APP COMPETITION**

13      Lastly, Apple attacks Professor McFadden's methodology on the basis that it does not

14  consider competition between app developers, instead treating them like monopolists to calculate

15  the prices they would set in the but-for world. Put another way, Apple's expert Professor Prince

16  argues that Professor McFadden assumes that app developers' prices are not sensitive to consumer

17  demand. (McFadden's Reply Report ¶ 21.) Plaintiffs oppose, noting that Professor McFadden's

18  model incorporates the reality of each app developer's competitive environment.

19      Apple again mischaracterizes Professor McFadden's methodology. Professor Prince

20  contends that Professor McFadden's model:

21      does not account for competition between apps, even within the same genre
        . . . . Instead, his model continues to assume that developers have no incentive to

22      respond to changes in the price of other apps, even if they are in the same genre or
        offer a substitutable product.

23

24  (Prince Report ¶ 191.) This is incorrect. Professor McFadden's model does consider competition

25  "through the price sensitivity of demand." (McFadden's Reply Report ¶ 120.) Modeling

26  competition through demand captures "how readily consumers switch to other apps should an app

27  _____

28      [6] In fact, in its *Daubert* motion, Apple noted that its price tiers and focal-point pricing had
    essentially the same impact. (Dkt. No. 476-11 at 22.)

United States District Court
Northern District of California

1   increase its price." (*Id.*) It is true, Professor McFadden notes, that his model does not include the

2   "strategic interactions between apps in the But-For world," but this decision, he argues is

3   "conservative."[7] (*Id.* at ¶ 122.)

4        Because Professor McFadden does model competition between apps by considering the

5   price sensitivity of demand in this section, the motion on this point is **DENIED.**[8]

6                  **2.    SUFFICIENCY OF DATA**

7        Apple challenges the sufficiency of Professor McFadden's data. It argues that Professor

8   McFadden uses a two-step process to estimate consumer price sensitivity. In the first step, Apple

9   states, Professor McFadden runs a regression on a 0.1% sample of transactions from the App Store

10  to get a coefficient. In the next step, Apple continues, Professor McFadden constrains that

11  coefficient by using profit margin bounds derived from a "tiny and unrepresentative" sample of six

12  app developers. Apple concludes that the Court should reject Professor McFadden's model for

13  imposing arbitrary and unrepresentative constraints.

14       To start, Apple again mischaracterizes the model. Professor McFadden does not proceed in

15  two steps—he calculates consumer price sensitivity with the requisite constraints in one step.

16  Apple has nothing to say against the reliability of this approach, which Professor McFadden

17  presents as a "standard computation tool." (McFadden's Decl. ¶ 80.)

18       Instead, Apple expends much ink arguing that Professor McFadden's margin bounds were

19  both arbitrarily chosen and imposed. The Court is not persuaded. First, plaintiffs note that, when

20  the model was initially run, Professor McFadden only had access to six developers' data. By trial,

21  plaintiffs state that they will receive profit data from significantly more developers and Professor

22  McFadden will correspondingly update his estimated coefficients. That is sufficient at this stage.

23  (*See* Previous Order at 10 n.8.) Moreover, Professor McFadden has produced unrebutted evidence

24

25       [7] Apple also argues that Professor McFadden's methodology is flawed because it does not
26  consider that "many apps are not subject to Apple's commission, so a change in commission rate
    may not translate to a decrease in the competitive price for competing apps." The Court previously
27  rejected Apple's argument that Professor McFadden should have considered free apps in his
    demand equation and does so for the same reasons now. (Previous Order at 13–14.)

28       [8] In fact, in the very next section, Apple acknowledges that a "pivotal step" in Professor
    McFadden's model is "estimating price sensitivity."

Case 4:11-cv-06714-YGR   Document 789   Filed 02/02/24   Page 14 of 28

1    that economists often infer costs, rather than inputting actual cost data, to estimate demand

2    because firms do not typically disclose their costs. (McFadden's Reply ¶ 148.) That Professor

3    McFadden can input actual app developer's costs here, even if minimal, increases the model's

4    reliability.

5        Second, Apple contends that Professor McFadden has no "objective methodology" for

6    translating his cost data into margin bounds and "instead appears to rely loosely on his review" of

7    the available app developer data. As an example, Apple notes that Professor McFadden calculates

8    the profit constraints for the Games Genre in the 60% to 90% range. This is so, Apple states,

9    despite the fact that the lowest actual profit margin he observed was 64% and the highest was

10   92.2%. This is a minor quibble—Professor McFadden notes from the beginning that he is using

11   these six developers' data to *estimate*, not precisely quantify, the average profit margin for the

12   sake of class certification. (McFadden's Reply Report ¶ 151.)

13       Third, Apple's contention that if Professor McFadden removed or changed the margin

14   constraints, the results would change, is a point in favor of the model's reliability, not against. If

15   the inputs change, then the results *should* change as well.

16       On this ground, the motion is **DENIED.**

17           **3.    RELIABILITY**

18       Apple next argues that Professor McFadden's model remains insufficiently robust by (i)

19   failing to consistently determine the percentage of unharmed accounts depending on the sample

20   used and (ii) producing different results even when using the same sample. Moreover, even though

21   Professor McFadden has now clarified the confidence level of the model, Apple contends that this

22   only masks how even slight changes to its margin constraints can cause millions of accounts to

23   switch from harmed to unharmed.

24       In the Court's Previous Order, it noted that Professor McFadden's model had a "switcher"

25   problem: the same account could switch from harmed to unharmed depending on which 0.1%

26   sample he used to calculate damages. The Court asked plaintiffs to address the issue. Plaintiffs

27   have now done so.

28       In his revised report, Professor McFadden first points out that switching is a natural

United States District Court
Northern District of California

14

consequence of using different samples which have different apps, transactions, and customers and therefore different margin constraints. (McFadden's 2nd Supplemental Report ¶ 50.) To account for and minimize this sampling error, Professor McFadden has now drawn seventy-five 0.1% samples, estimated consumer demand based on these samples, taken the average of the seventy-five coefficients obtained, and used the averaged coefficients to estimate damages across all transactions from the App Store at a 95% confidence level. (*Id.* ¶ 54.)

Apple now pivots to a different argument. It contends that Professor McFadden has a switcher problem because accounts change from harmed to unharmed depending on the margin constraint used. McFadden explains that this is a feature not a bug. Logically, if Apple changes the margin constraints of the model—by, for example, arbitrarily imposing a 70%-90% profit range to make its point rather than the 60%-90% estimated by Professor McFadden—many accounts will switch from harmed to unharmed.[9]

When actually using the same samples and constraints as Professor McFadden, Apple's own expert arrived at consistent results. Instead of using seventy-five 0.1% samples and then averaging them, Apple's expert Professor Watson used a 7.5% sample that contained the same accounts. (McFadden's Decl. ⁋ 91.) Professor Watson's slightly different method produced slightly different results: a lower price sensitivity that resulted in 2.2% fewer harmed accounts. (*Id.* at ⁋ 92.) Apple notes that this equals 3.9 million accounts switched but ignores that 170 million stayed the same. (*Id.*) This does not shake Professor McFadden's 95% confidence interval but instead serves to confirm it. That the pool of putative class members is so high does not change the result.

Again, Apple's arguments here go to weight, not admissibility. They are fodder for cross-examination, not reason to exclude Professor McFadden's testimony. For the reasons set forth above, Apple's *Daubert* motion on this ground is **DENIED.**

---

[9] The same goes for Apple's first argument—that when Professor McFadden fixed an issue where certain apps were in the incorrect genre, a small percentage of accounts switched from harmed to unharmed. Because different genres have different constraints in Professor McFadden's model, this type of change demonstrates that the model reacts to different inputs as a reliable model should.

United States District Court
Northern District of California

United States District Court
Northern District of California

### C.    DR. ABRANTES-METZ'S CHALLENGED OPINIONS[10]

Dr. Abrantes-Metz opines that, in a but-for world, Apple would have charged a 13.63% commission rate in its App Store. Apple moves to exclude Dr. Abrantes-Metz's expert opinion on four grounds: (1) Dr. Abrantes-Metz has not applied her previous economics expertise to present her current expert opinion, producing an "accounting identity" rather than an economic model; (2) her but-for commission rate rests on untenable assumptions; (3) her inputs are unreliable; and (4) her benchmark analysis is arbitrary.[11] The Court evaluates each.

#### 1.    RELIABLE APPLICATION OF EXPERTISE

First, Apple seeks to exclude the opinion on the grounds it is a product of an "accounting identity," rather than an economic model. Because this accounting identity lacks "any economic content or predictive power," Apple argues, Dr. Abrantes-Metz's analysis is not a reliable application of her expertise. This is most noticeable, Apple concludes, in her disregard of indirect network effects.

Dr. Abrantes-Metz is a Ph.D. economist specializing in industrial organization,

---

[10] Apple also argues that the Court must exclude Professor McFadden's entire model because, even though he relies on Dr. Abrantes-Metz's but-for commission rate, he never read the underlying report that justifies it.

Fed. R. of Evid. 703 permits an expert to base his opinion on "facts or data in the case that the expert has been made aware of." This includes data presented to the expert "outside of court and other than by his own perception." Fed. R. of Evid. 703, Notes of Advisory Committee. In that way, Rule 703 reflects the reality that it is now "common in technical fields for an expert to base an opinion in part on what a different expert believes on the basis of expert knowledge not possessed by the first expert." *Dura Automotive Systems of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 613 (7th Cir. 2002). That is what Professor McFadden has done here—based his opinion in part on Dr. Abrantes-Metz's expertise in industrial organization and multi-sided platforms, expertise the Court previously noted he lacked. Whether the but-for commission rate is suspect, therefore, is properly addressed through Apple's challenge of Dr. Abrantes-Metz's opinion, not Professor McFadden's. Apple's *Daubert* motion on this ground borders on disingenuous and is therefore **DENIED.** Counsel is cautioned not to engage in such specious arguments.

[11] In its supplemental brief on Judge Donato's recent order excluding the opinion of consumer plaintiffs' expert in *In re Google Play Store Antitrust Litig.*, No. 21-md-2981-JD (N.D. Cal. Aug. 28, 2023), Apple also argues that Judge Donato's order there supports excluding Professor McFadden and Dr. Abrantes-Metz's opinions here. The Court disagrees. Other than noting that Judge Donato's order excluded the proffered expert opinion for its unsupported assumptions, an argument Apple already makes in its *Daubert* motion, Apple does not explain how Judge Donato's order is relevant here.

United States District Court
Northern District of California

1    econometrics, and finance. (Dr. Abrantes-Metz's Opening Report ¶ 1.) She is currently the

2    Principal at the Brattle Group and Co-chair of its Global Antitrust and Competition Practice. (*Id.*)

3    Formerly, she was an adjunct professor at the Leonard N. Stern School of Business at New York

4    University, where she taught industrial organization and competitive analyses. (*Id.*) Before that,

5    she was an economist at the Federal Trade Commission. (*Id.* ¶ 2.) Plaintiffs present Dr. Abrantes-

6    Metz as a qualified expert on benchmark analyses that would have prevailed but-for allegedly

7    anticompetitive conduct. (*Id.* ¶ 3.) Apple does not challenge her expertise.

8         Dr. Abrantes-Metz asserts that she used her expertise to create an "economic model" to

9    calculate her but-for commission rate "based on the fundamental principles that an app store's

10   operating profit margin is equal to the difference between the revenue it earns and the costs it

11   incurs, and its revenue depends on its market share and the price (commission rate) it charges."

12   (*Id.* ¶ 21.) To apply that equation, Dr. Abrantes-Metz estimated that Apple would have a 76.9%

13   market share, while the hypothetical rival app store acquired the other 23.1%, using surveys

14   developed by one of Apple's experts. (*Id.* ¶ 35.) She then assumed that the rival app store's profit

15   margin would be 23%. (*Id.* ¶ 43.) Dr. Abrantes-Metz drew this figure from data about the

16   Microsoft Store, which in 2019 reported a profit margin of 23%. (*Id.*) The Microsoft Store is an

17   appropriate benchmark, Dr. Abrantes-Metz posited, because it is an established rival to Steam in

18   the sale of Windows PC game apps. (*Id.* ¶ 47.) This is analogous to the but-for world on which she

19   modeled her commission rate. (*Id.*) Finally, Dr. Abrantes-Metz assumes that a rival app store's

20   variable and fixed costs are the same as Apple's App Store (3.8% of total billings and $786

21   million, respectively). (*Id.* ¶ 55.) She then plugs these figures into her economic model to calculate

22   the but-for commission rate.

23        Apple's criticism is, essentially, that Dr. Abrantes-Metz erred in using an equation rather

24   than an economic model. This is pedantic; economic models generally consist of mathematic

25   equations that describe a theory of economic behavior. That Dr. Abrantes-Metz's economic model

26   consists of one mathematical equation does not mean that she has "no theory of economic

27   behavior underpinning her analysis," as Apple charges. Dr. Abrantes-Metz explains, step by step,

28   how she calculates the "fundamental principles" underpinning her equation. (*Id.* ¶ 21.) And though

17

United States District Court
Northern District of California

1    Apple may disagree with her inputs (as analyzed below), it has nothing to say about why those

2    fundamental principles are not a reliable application of her expertise.

3         Nor does Apple's argument that Dr. Abrantes-Metz fails to reliably apply her economic

4    expertise by ignoring indirect network effects persuade. Dr. Abrantes-Metz relied on Professor

5    McFadden's market definition—a single aftermarket for the sale of iOS apps and in-app content to

6    consumers—in constructing her model. (*Id.* ¶ 20.) The Court previously found that Professor

7    McFadden's market definition was sufficiently reliable for purposes of class certification.

8    (Previous Order at 4.) In doing so, the Court rejected Apple's argument that Professor McFadden

9    ignored the two-sidedness of Apple's App Store and its indirect network effects. (Dkt. No. 476-3.)

10   As the Court already warned Apple, it will not reconsider that ruling.[12]

11        On that ground, Apple's motion is **DENIED.**

12              **2.    ASSUMPTIONS**

13        Apple next argues that Dr. Abrantes-Metz's model relies on untenable assumptions about

14   the but-for world: (1) that Apple would only have one other competing app store; (2) both app

15   stores would charge identical commission rates; and (3) the hypothetical app store would provide

16   identical terms and services to the App Store.

17        First, Dr. Abrantes-Metz has sufficiently defended her assumption that, in the but-for

18   world, the App Store would face one, smaller competitor. She conservatively chose to model a

19   duopoly, rather than a market with multiple rivals, because of the unremarkable and well-

20   supported proposition in economics that more competition equals lower prices. (Dr. Abrantes-

21   Metz's Opening Report ¶ 36; Dr. Abrantes-Metz's Decl. ¶ 43.) Apple does not dispute this basic

22   tenet but instead argues that, under Dr. Abrantes-Metz's model, having more than one rival app

23   store would actually increase Apple's but-for commission rate. Professor Hitt, Apple's expert,

24   arrives at this counterintuitive conclusion by changing the respective market shares in Dr.

25   Abrantes-Metz's existing model while maintaining the same profit margins. (Hitt Report ¶ 296.)

26   _____

27        [12] Apple also makes the argument that Dr. Abrantes-Metz erred by only considering some
     of the factors she has considered in other works. This argument relates to the strength of the
28   opinion, not the reliability of the principles upon which it is based. (*See* Dr. Abrantes-Metz's
     Reply Report ¶ 40.)

1    As Dr. Abrantes-Metz states, it makes no economic sense to presume that "more competition

2    increases prices but does not reduce profitability." (Dr. Abrantes-Metz's Decl. ¶ 44.)

3          Second, Dr. Abrantes-Metz sufficiently explains her reason for postulating that, in the but-

4    for world, Apple and its competitor would charge identical commission rates. In Dr. Abrantes-

5    Metz's but-for world, Apple and the rival app store would have started at the same time and

6    provided the same services. It follows, Dr. Abrantes-Metz argues, that they would have charged

7    the same price, or commission rate, to their consumers. (Dr. Abrantes-Metz's Report ¶ 28; Dr.

8    Abrantes-Metz's Decl. ¶¶ 68–69.) This is not true of just the but-for world; in the as-is world,

9    competitors like Microsoft and Steam charged the same commission rate for years until a new

10   competitor, Epic Games, forced Microsoft to *lower* its commission rate. (Dr. Abrantes-Metz's

11   Decl. ¶ 73.) If anything, these benchmarks demonstrate that assuming an identical commission

12   rate among the two competitors Dr. Abrantes-Metz posits would exist in the but-for world is

13   conservative.

14         Moreover, Dr. Abrantes-Metz explained why her model predicts that, in the but-for world,

15   Apple would charge a single rate, rather than tiered rates. While tiered rates in the but-for world

16   are possible, Dr. Abrantes-Metz explains, she does not think they are likely because commission

17   rates would be much closer to costs. (Dr. Abrantes-Metz's Reply Report ¶ 60 n.114.) If she had

18   modeled a tiered commission rate system, Dr. Abrantes-Metz notes, her predicted 13.63% but-for

19   rate would be at the higher tier, not the lower. (*Id.* ¶ 63.) This is because she modeled her but-for

20   commission rate on Microsoft's profits from game sales in 2019, when Microsoft charged a 30%

21   commission rate on games and a 15% commission rate on non-game apps. (*Id.*)

22         Third, Dr. Abrantes-Metz's assumption that Apple and its hypothetical rival would provide

23   identical services in the but-for world is well explained. Dr. Abrantes-Metz's cites to economic

24   literature for the proposition that two competitors in a duopoly would provide the same services.

25   (Dr. Abrantes-Metz's Opening Report ¶ 28 n.14.) Apple's experts do not contest that economists

26   use symmetric competitors to design economic models—one of Apple's experts, Professor Hitt,

27   stated in his deposition that it is not an "unusual assumption"—but instead speculate that in the

28   but-for world Apple might try to differentiate itself by, for example, offering a consumer rewards

United States District Court
Northern District of California

1    program. (Schmalensee Report ¶ 92.) Such speculation in the face of widely accepted principles

2    goes to weight, not admissibility.

3         For those reasons, Apple's motion in this regard is **DENIED.**

4         **3.    INPUTS**

5         Apple next argues that, even if Dr. Abrantes-Metz's model is sound, her inputs are not.

6    Apple first takes issue with the fact that Dr. Abrantes-Metz assumes that the relevant market in the

7    but-for world was at all times the same as it was in 2019. Dr. Abrantes-Metz's model, in fact, does

8    not assume a constant market size; instead, she assumes that *billings* in the as-is and but-for world

9    are the same. In other words, she assumes that billings would not increase as a result of lower

10   commission rates. (Dr. Abrantes-Metz's Opening Report ¶ 56; Dr. Abrantes-Metz's Decl. ¶¶ 79–

11   81.) This, she explains, is a conservative assumption because modeling that billings would

12   *increase* in the but-for world would result in a *lower* but-for commission rate. Dr. Abrantes-Metz

13   did take into account other market sizes when she, for example, input Apple's app billings from

14   2018 (not 2019) to check her model. (Dr. Abrantes-Metz's Reply Report ¶ 106.)

15        As another example, Apple attacks Dr. Abrantes-Metz's use of only one platform—

16   Microsoft—to determine the rival app store's profit margin in the but-for world. Dr. Abrantes-

17   Metz, however, sufficiently explained her process for choosing Microsoft as an input. (Dr.

18   Abrantes-Metz's Opening Report ¶ 43.) To model a duopoly, she looked for an app store that had

19   a high enough profit margin to support its entry and continued operation in the market but not so

20   high it would attract other rivals. (Dr. Abrantes-Metz's Decl. ¶ 115.) She researched various

21   choices and explained why she rejected them—noting that the Google Play store is accused of

22   charging anticompetitive prices while Epic Games is known to charge a below-competitive one.

23   (Dr. Abrantes-Metz's Opening Report ¶¶ 66, 90.) She then explained that she ultimately settled on

24   Microsoft because it had a similar functionality to the Apple app store; was an established,

25   profitable rival to a larger competitor, Steam; and using its 2019 profile allows Dr. Abrantes-Metz

26   to calculate what Microsoft's profit margin was after a new competitor, Epic Games, entered the

27   market but before Microsoft cut its commission rates in response. (Dr. Abrantes-Metz's Decl.

28

1   ¶ 125.)[13]

2        Finally, Apple argues that Dr. Abrantes-Metz's input for the hypothetical rival store's

3   market share is unfounded. Dr. Abrantes-Metz used the survey results from Apple's own expert,

4   Dr. Simonson, to conclude that Apple and its hypothetical rival would have a 76.9/23.1% split of

5   the market. As Dr. Abrantes-Metz explained, this is a conservative input in Apple's favor—in that

6   but-for world, Apple's share of the market would still be highly concentrated. (Dr. Abrantes-

7   Metz's Opening Report ¶ 113.) In fact, another of Apple's experts noted that it would have been

8   reasonable for Dr. Abrantes-Metz to model a 50/50% split with a lower but-for commission rate.

9   (Dr. Abrantes-Metz's Reply Report ¶ 114.) Yet Apple argues that, if Dr. Abrantes-Metz is using

10  the Microsoft Store's profit margin from 2019, she should input its 2019 market share of 7.7% as

11  well into her model. Dr. Abrantes-Metz explains why she rejects the resulting 92.3/7.7% split—it

12  is far too concentrated to be a model of a truly competitive duopoly where both competitors

13  entered the market on the same footing. (Dr. Abrantes-Metz's Opening Report ¶ 110.)  Dr.

14  Abrantes-Metz has sufficiently justified the opinion. Apple's objection may be reraised on cross-

15  examination.

16       Apple's motion on this point is **DENIED.**

17            **4.    BENCHMARK ANALYSIS**

18       Finally, Apple argues that Dr. Abrantes-Metz's benchmark comparison is cherry-picked.

19  To check her conclusion that, in the but-for world, Apple's commission rate would be 13.63%, Dr.

20  Abrantes-Metz did a benchmark marketplace analysis. A good benchmark must "share key

21  features of the relevant marketplace in question, while at the same time being as free as possible of

22  anti-competitive conduct." (Dr. Abrantes-Metz's Reply Report ¶ 168.) She first considered various

23  candidates: the Windows PC Game apps, Android apps, MacOS apps, and Steam games. Dr.

24

25        [13] In its Reply, Apples argues for the first time that Dr. Abrantes-Metz's but-for
    commission rate should be excluded because while Microsoft's profit margin (on which Dr.
26  Abrantes-Metz relied) was 23% in 2019, in 2020 it was 55% while in 2021 it was 43%.
    Arguments presented for the first time on reply are disfavored and can be disregarded. In any case,
27  Dr. Abrantes-Metz already explained why she thought Microsoft's *2019* profit margin was
    particularly well-suited, as explained above. Moreover, even with a 13.63% but-for commission
28  rate, Dr. Abrantes-Metz still calculates that Apple would earn a 57.2% profit. (Dr. Abrantes-
    Metz's Opening Report ¶ 23.) That is sufficient.

21

1  Abrantes-Metz explained why she rejected those benchmarks. For example, she states, Google

2  purportedly raised barriers to entry by requiring Android device manufacturers to prominently

3  display the Google Play store on their devices while Epic Games lowered its commission rate to

4  break into the marketplace at the cost of negative operating profits. (Dr. Abrantes-Metz's Opening

5  Report ¶ 49.) In the end, she concluded that the Windows Store was the most appropriate

6  benchmark for two reasons: the Windows Store and Apple App store are similar in the services

7  they provide, and, unlike Apple, Microsoft does not impose significant barriers to entry. (Dr.

8  Abrantes-Metz's Opening Report ¶ 64.)

9        Apple does not dispute that Windows Store is a suitable benchmark.[14] Instead, it argues

10  that Dr. Abrantes-Metz excluded other benchmarks with 30% commission rates, like the Google

11  Play Store and Steam, while including the 12% commission rates of Microsoft and Epic Games in

12  her analysis. As stated above, Dr. Abrantes-Metz excluded the Google Play Store because of its

13  allegedly anticompetitive conduct.[15] Given that an important part of conducting her check was

14  finding a benchmark as free as possible of anticompetitive conduct (a qualification Apple does not

15  contest), Dr. Abrantes-Metz sufficiently explained why she excluded the Google Play Store.[16] Dr.

16  Abrantes-Metz did *not*, however, exclude Steam from her analysis. (Dr. Abrantes-Metz's Opening

17  Report ¶ 119; Dr. Abrantes-Metz's Reply Report ¶ 170.) Though Dr. Abrantes-Metz argued that

18  Steam *should* be excluded because of its anticompetitive conduct, she ran her benchmark analysis

19  *with* Steam and found that the but-for commission rate would range from 13.91%-14.18%, which

20

21        [14] Apple does argue that Dr. Abrantes-Metz was inconsistent in considering Google's
22  anticompetitive conduct but ignoring the fact that the Federal Trade Commission recently sued
   Microsoft over its significant power in the video game market. But, as Dr. Abrantes-Metz states,
23  FTC's complaint was over Microsoft's proposed merger with Activision, which had not taken
   place and so could not have influenced its then-existing commission rate. (Dr. Abrantes-Metz's
24  Reply Report ¶ 165.)

25        [15] A jury recently convicted Google for the anticompetitive policies of its Play Store. *In re
   Google Play Antitrust litigation*, No. 21-md-2981-JD.
26
        [16] Dr. Abrantes-Metz also explained why the Amazon and Samsung Stores were not
27  suitable benchmarks for the deployment of Android apps: given Google's allegedly
   anticompetitive conduct, which has kept the Samsung Galaxy Store and Amazon Appstore from
28  becoming true rivals in this space, neither was a good example on which to model a truly
   competitive duopoly. (Dr. Abrantes-Metz's Reply Report ¶ 143.)

United States District Court
Northern District of California

1    was consistent with her final rate of 13.63%. (Dr. Abrantes-Metz's Reply Report ¶ 170.)

2    Moreover, Dr. Abrantes-Metz adequately defended her decision to include Microsoft and

3    Epic Games' 12% commission rate. Though Microsoft charged a 30% commission rate in its PC

4    games store and stated it would not lower its commission rate on its platform, once Epic Games

5    entered the market, Microsoft eventually did lower its commission rate to 12% in response. (Dr.

6    Abrantes-Metz's Opening Report ¶¶ 111–113.) Dr. Abrantes-Metz concluded that including the

7    way Microsoft changed its commission rate when faced with "stiff competition" in her analysis

8    was a useful predictor of what the range of commission rates would look like for Apple in the

9    more competitive, but-for world. (*Id.* ¶ 115.)

10   Finally, Apple argues that Professor Abrantes-Metz's analysis was skewed by including

11   direct-to-consumer platforms, or platforms that distribute their own apps. As Dr. Abrantes-Metz

12   explains, however, including direct-to-consumer platforms, which do compete in the same market,

13   is the more holistic approach. Moreover, Apple's argument that direct-to-consumer platforms

14   should be excluded because they do not face the same costs ignores that self-distribution is not

15   "free"; direct-to-consumer platforms have to choose between the costs of building and marketing a

16   new platform or paying the commission rates of established ones like the Apple App Store. In

17   either situation, there are distribution costs involved.

18   Apple's *Daubert* motion is **DENIED.**

19   **III.   CLASS CERTIFICATION**

20   Plaintiffs once again move for class certification under Rule 23(b)(3) based on Apple's

21   allegedly anticompetitive conduct. In its Previous Order, the Court found that plaintiffs met the

22   requirements of Rule 23(a) which are summarized above. Here, therefore, it analyzes only whether

23   plaintiffs can now satisfy the predominance requirement of Rule 23(b)(3).

24   **A.    LEGAL FRAMEWORK**

25   Under Rule 23(b)(3), a court must find that "the questions of law or fact common to class

26   members predominate over any questions affecting only individual members, and that a class

27   action is superior to other available methods for fairly and efficiently adjudicating the

28   controversy." "An individual question is one where 'members of a proposed class will need to

United States District Court
Northern District of California

23

United States District Court
Northern District of California

1   present evidence that varies from member to member,' while a common question is one where 'the

2   same evidence will suffice for each member to make a prima facie showing [or] the issue is

3   susceptible to generalized, class-wide proof.'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442,

4   453 (2016) (citation omitted). The "predominance inquiry asks whether the common, aggregation-

5   enabling issues in the case are more prevalent or important than the non-common, aggregation-

6   defeating, individual issues." *Id.* (quoting 2 W. Rubenstein, 2 Newberg on Class Actions § 4:49

7   (5th ed.)).

8       "In carrying the burden of proving facts necessary for certifying a class under Rule

9   23(b)(3), plaintiffs may use any admissible evidence," including expert evidence. *Olean*

10  *Wholesale Grocery Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir.

11  2022). Just because the proffered expert evidence is admissible, however, does not mean that a

12  court can certify a class. A court must decide if the expert's methodology is "capable of showing

13  class-wide antitrust impact" in light of "factors that may undercut the model's reliability (such as

14  unsupported assumptions, erroneous inputs, or nonsensical outputs)."

15      **B.   PREDOMINANCE**

16      In its Previous Order, the Court excluded plaintiffs' expert testimony and thus found they

17  could not satisfy the predominance requirement.[17] Now that the Court has found otherwise, the

18  only dispute left is whether plaintiffs can prove antitrust injury on a classwide basis.[18]

19      Core to the predominance analysis is whether plaintiffs' class definition sweeps in a

20  statistically significant number of uninjured class members. In the last round of briefing, plaintiffs

21  conceded that their class definition included an estimated 14.6% of uninjured class members.

22  (Previous Order at 23.) The Court then noted that the Ninth Circuit had not "squarely addressed

23

24          [17] The Court previously expressed its concern with plaintiffs' proposed plan of proving
    classwide damages by running Professor McFadden's model after trial. (Previous Order at 25–27.)
25  Plaintiffs have now affirmed to the Court that Professor McFadden will calculate both aggregate
    and individual damages *before trial* with the full transactions data of the entire App Store. Given
26  that, the Court now finds that plaintiffs have satisfied the predominance requirement as to
    damages.

27          [18] In its opposition to plaintiffs' motion for class certification, Apple raises many of the
    same arguments made in its *Daubert* motion. The Court incorporates its analysis above but does
28  not regurgitate the reasons for rejecting the arguments.

United States District Court
Northern District of California

1  the issue of whether a particular percentage of uninjured class members defeats predominance,"

2  but, given the errors in Professor McFadden's methodology, the Court found that individual issues

3  would predominate regardless because plaintiffs could not reliably identify which class members,

4  and how many, were injured. (Previous Order at 25.)

5      Plaintiffs now seek to narrow the class. Plaintiffs currently estimate that 17.8% of Apple

6  accounts have not suffered an overcharge due to Apple's allegedly anticompetitive conduct.

7  (McFadden's 2nd Supplement Report ¶ 16.) Because there are many more accounts than iPhone

8  users, plaintiffs surmise that the actual number of class members that are uninjured is significantly

9  lower. In any case, in response to the Court's overbreadth concerns, plaintiffs have now narrowed

10  their class definition to only include Apple account holders who have spent $10 or more on app or

11  in-app content. Under this narrowed definition, Professor McFadden estimates that the class

12  includes only 7.9% uninjured members. (*Id*.)

13      Notably, since the Court's Previous Order, an *en banc* panel of the Ninth Circuit rejected

14  the argument that "Rule 23 does not permit the certification of a class that potentially includes

15  more than a de minimis number of uninjured class members." *Olean Wholesale Grocery*

16  *Cooperative, Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 (9th Cir. 2022). Nevertheless, the

17  Ninth Circuit stated, a district court "must consider whether the possible presence of uninjured

18  class members means that the class definition is fatally overbroad." *Id.* at 669 n.14. The problem

19  with a class definition that includes uninjured class members is "the obverse of a different problem

20  with class definition: the problem of the 'fail-safe' class: one that is defined so that whether a

21  person qualifies as a member depends on whether the person has a valid claim." *Messner v.*

22  *Northshore University HealthSystem*, 669 F.3d 802, 825 (7th Cir. 2012). "Defining a class so as to

23  avoid, on one hand, being over-inclusive and, on the other hand, the fail-safe problem is more of

24  an art than a science." *Id*. Both, however, "can and often should be solved by refining the class

25  definition rather than by flatly denying class certification on that basis." *Olean*, 31 F.4th at 669

26  n.14 (quoting *Messner*, 669 F.3d at 825).

27      In *Olean*, defendants argued on appeal that the district court abused its discretion in

28  certifying a class that potentially included 28% uninjured class members. 31 F.4th at 680. The

United States District Court
Northern District of California

Ninth Circuit rejected this argument, holding that all that is necessary at the class certification stage is a finding that an expert's model was "*capable* of showing" that all class members suffered antitrust impact on a classwide basis, even those with "limited transactions." 31 F.4th at 681.

The same is true here. Professor McFadden's model can show the impact of Apple's allegedly anticompetitive conduct across all class members. He has now run his revised model on all the App Store transactions across the Games, Music, and Entertainment genres and can compute which Apple accounts suffered damages and which did not. Plaintiffs have represented to the Court that, once Apple produces the rest of its app transactional data, Professor McFadden will be able to calculate the exact extent of injury suffered by each class member. Acknowledging that an estimated 17.8% of accounts in Professor McFadden's model are uninjured, plaintiffs have revised their class definition to limit the number of uninjured class members.

While the Court remains concerned that the $10.00 cutoff results in an estimated 7.9% or 10,283,035 million uninjured accounts, it expects, given plaintiffs' representations, that once the model is fully run, that number will be reduced[19] or the cutoff could be changed to reduce the impact of including unharmed accounts. Accordingly, under *Olean*, the predominance requirement is met.

Apple's arguments otherwise do not persuade. According to Apple, *Olean* is distinguishable because all or virtually all class members in that case were harmed.[20] This is not the case—in *Olean*, up to 28% of the class was uninjured, significantly more than the 7.9% posited by plaintiffs here. It is true that in this case, the number of uninjured accounts numbers in

---

[19] *See* Dkt. No. 786-1, Declaration of Minjae Song, Ph.D. in Response to Order for Supplemental Information in Further Support of Renewed Motion for Class Certification. The attendant motion to seal is **GRANTED**.

[20] Apple argues also that the First Circuit's opinion in *In re New Motor Vehicle Canadian Export Antitrust Litig.*, 522 F.3d 6 (1st Cir. 2008), supports its position here. To start, the Ninth Circuit in *Olean* noted that *In re New Motor* was distinguishable because the First Circuit found that the case could not proceed on jurisdictional grounds and so the rest of its analysis on class certification was dictum. *Olean*, 31 F.4th at 678 n.26. In any case, Apple's arguments about why *In re New Motor* supports its position go to the admissibility of Professor McFadden's model, rather than whether it provides common evidence in support of class certification. The Court rejects these arguments for the same reason it denies Apple's *Daubert* motion.

United States District Court
Northern District of California

1   the millions. The Ninth Circuit in *Olean*, however, rejected the argument that Rule 23 has an

2   uninjured class member cutoff beyond which class certification is impermissible. That position is

3   "inconsistent with Rule 23(b)(3), which requires only that the district court determine after

4   rigorous analysis whether the common question predominates over any individual questions." *Id.*

5   at 669. The model, once run, will answer the common question of whether Apple's conduct

6   caused class members to suffer an antitrust injury. At this juncture, the Court cannot "flatly reject"

7   class certification because the pre-run model shows an estimated 7.9% of the class is uninjured.

8   *See id.,* n.14.

9       For those reasons, plaintiffs' motion for class certification is **GRANTED.**

10      **C.**    **APPOINTING CLASS REPRESENTATIVES AND CLASS COUNSEL**

11      In its Previous Order, the Court noted that the proposed Class Representatives—plaintiffs

12   Stephen H. Schwartz, Edward W. Hayter, Robert Pepper, and Edward Lawrence—were each both

13   typical and adequate. (Previous Order at 20). Consumer plaintiffs now move to appoint them as

14   class representatives. Apple does not oppose. The motion to do so is **GRANTED.**

15      The Court also noted, in its Previous Order, that it had "no concerns" regarding the

16   adequacy of Wolf Haldenstein Adler Freeman & Herz LLP and Kellogg, Hansen, Todd, Figel &

17   Frederick, P.L.L.C. to serve as co-class counsel. (Previous Order at 20 n.11.) Consumer plaintiffs

18   move to appoint Wolf Haldenstein and Kellogg Hansen as co-class counsel. Apple, again, does not

19   oppose this request. The motion in this respect is also **GRANTED.**

20   **IV.**   **CONCLUSION**

21      For the foregoing reasons, Apple's *Daubert* motion is **DENIED** and plaintiffs' motion for

22   class certification is **GRANTED.**

23      The Court sets a Case Management Conference for February 26, 2024, at 2:00 p.m. on the

24   Zoom platform. Parties shall meet and confer on a schedule for the balance of the action. By no

25   later than February 16, 2024, the parties shall file a joint statement with the proposed schedule

26   including (i) the *earliest* date by which they will be in a position to file all remaining motions,

27   including trial-related motions, (ii) any trial conflicts within six (6) months thereafter; and (iii) the

28   timeframe within which Professor McFadden will run his model on the rest of the App Store

transactional data and whether the model can successfully ascertain the number of uninjured class members and limit them.

This Order terminates Docket Nos. 683, 690 and 786.

**IT IS SO ORDERED.**

Dated: February 2, 2024

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**